F. M. SIBLEY LUMBER CO. *v.* DORAN.

PRINCIPAL AND AGENT—UNDISCLOSED PRINCIPAL—LIABILITY FOR MATERIALS FURNISHED AGENT—AMBIGUITY—QUESTION FOR JURY.

In an action against the owners of a building constructed from materials furnished by plaintiff to the contractor, alleged to be the agent of defendants, as undisclosed principals, *held*, error to direct a verdict for plaintiff, and, the contract between the defendants and the contractor being ambiguous and the testimony in direct conflict,

that the questions as to defendants' liability and the extent thereof were for the jury, under proper instructions.

Error to Wayne; Goff (John H.), J.   Submitted November 2, 1921.   (Docket No. 155.)   Decided December 22, 1921.

Assumpsit by the F. M. Sibley Lumber Company against David Doran and another for lumber furnished under a building contract.   Judgment for plaintiff on a directed verdict.   Defendants bring error.   Reversed.

*James H. Pound,* for appellants.

*Lyle G. Younglove* and *Lloyd T. Chockley,* for appellee.

MOORE, J.   Mr. and Mrs. Doran were owners by the entireties of land in Detroit.   They made a contract reading as follows:

"This agreement entered into this, the eighteenth day of October, between Mr. and Mrs. David Doran and H. G. Wilson.   The party of the second part agrees to build a building on lot 54, south half of lot 53 of Distel subdivision.   All building material to be furnished on said building to have bill furnished to the said party, David Doran and wife, from the said H. G. Wilson, at said price and discount from said firms purchased, also, all labor.   The said H. G. Wilson to receive 10% of the cost of said building.   He is to look after the building until completed in the quickest possible way and finish it up in workmanship like manner.

"HARVEY G. WILSON.
"DAVID DORAN.
"ELLA E. DORAN."

Mr. Wilson entered upon the construction of the building but did not finish it, and the defendants were obliged to do so.   The major part of the lumber which

217 Mich.—8.

entered into the construction came from the plaintiff and was paid for only in part. The plaintiff company filed a bill to establish a lien for the value of the lumber. That case found its way into this court. *F. M. Sibley Lumber Co.* v. *Doran,* 203 Mich. 280. The bill of complaint was dismissed because plaintiff failed to meet the burden of proof that the statement of lien was filed in time. Later Mr. Wilson began suit against the Dorans on the law side of the court for what he claimed was due him under the contract, and obtained a judgment for about $200.

October 4, 1918, this suit was commenced, the plaintiff claiming that Mr. Wilson was the agent of principals, whose names he did not disclose when the lumber was bought, and that the undisclosed principals were the defendants. The case was tried before a jury. At the close of all the testimony both parties asked for a directed verdict and defendants asked that, if their motion for a directed verdict was denied, the case be submitted to the jury. The trial judge directed a verdict for the full amount of the claim of the plaintiff, $1,887.77. The defendants moved for a rehearing. This motion was overruled and the case is here by writ of error.

The record is somewhat long and one of the briefs is long and the respective claims of the parties are not very clearly stated, but as nearly as we can make them out, after a careful reading of the record and briefs, it may be said that Mr. Wilson ordered the lumber from the plaintiff at about the same time it was furnishing him lumber which went into one or more other buildings that he was constructing. The lumber was all charged to Mr. Wilson in the first instance, and plaintiff did not know what his contract with defendants was, until the trial of the lien case to which we have referred. The plaintiff claims that the contract made it the duty of the defendants to buy

the material that entered into the construction of the house, and by inference at least authorized Mr. Wilson to act as their agent in its purchase, and that this is indicated not only by the language of the contract, but by the construction put upon it by the parties and also by an admission made by defendants' counsel in one of the other lawsuits to which we have referred.

It is the claim of defendants that the contract was dictated by Mr. Wilson, and that he should have inserted therein the agreement as to the cost of the house, which was to be $4,000 plus a commission of $400 for his services, and that it was his duty in the first instance to furnish the material and labor and that when so furnished, upon the presentation of the bills it became the duty of the defendants to pay the amount thereof when satisfied that they were correct.    It is their further claim that they paid to Mr. Wilson the amount of the bills presented by him, and that he failed to make a payment to the plaintiff of $500 which defendants paid to him to be applied on the lumber bill, and that this five hundred dollars, it is said by innuendo, was credited upon Mr. Wilson's bill for lumber that did not go into defendants' house. It is the further claim of defendants that, even though they may be liable for some amount, the judgment is much too large, and that two questions should have been submitted to the jury:    *First,* Were there any contractual relations between the plaintiff and defendants? and, *second,* Was there any liability upon the facts disclosed by this record?    It is insisted that the purchase of the lumber from the plaintiff was made by Mr. Wilson, was charged to him, and that it was not until the chancery case, brought to establish a lien, failed, that it was conceived that this case could be maintained upon the theory of an undisclosed principal.    It is also insisted that the conduct of defendants is entirely consistent with the above claims.

· The questions which it is said were for the jury
were: *First,* If under all the circumstances there was
liability; and, *second,* Is not the verdict too large be-
cause the payment of $500 made to Mr. Wilson to
apply on the lumber was not credited to the defend-
ants?

At one time an effort was made between the rep-
resentative of the plaintiff and the defendants to agree
upon an amount the defendants ought to pay.   We
quote from the record some of Mrs. Doran's testi-
mony:

"*Q.* What conversation did you have with Mr.
Campbell or Mr. Campbell with you at the time?   *
*   *   He said he had entire control.   Witness: Well,
my husband had the most conversation.

"*Q.* Well, I am asking you what you heard?

"*A.* I heard my husband ask Mr. Campbell what
our bill was for lumber that we had been furnished
in our house.'

"*Q.* What reply did Mr. Campbell make?

"*A.* Mr. Campbell said we owed $845 for lumber
furnished in our house.   But we owed Mr. Wilson
$500 and some odd dollars.   I could not tell just
exactly.   I think $525.

"*Q.* Well, now go ahead.   State what else was said.

"*A.* Well my husband said,   'What has Mr. Wilson's
bill to do with our bill?'        -

"*Q.* What did you say, if you said anything in
reference to the bill that he put up against you?

"*A.* I said I didn't owe that much for lumber.   *
*   *

"Mr. Borgman asked him to come up to the bank
and asked him how much he had coming to him.   He
said $845.   Whereupon he told him to come up to the
desk to get the check and he would not accept it unless
we paid Mr. Wilson's bill.

"*Q.* He would not accept it?

"*A.* No, sir.   *   *   *

"*Q.* What else was said?

"*A.* Then I said, 'Mr. Campbell how much do I owe
you for lumber in our building?'   He said $845, but
we have Mr. Wilson's bill $500 and something and I

said, "That is not the question.     I asked you how much do we owe you for lumber in our building?'

"Q. Now then, what did you say to that?

"A. I said, 'You come down to the bank and I will give you a check for that amount, $845.'

"Q. What reply did he make to you?

"A. He said he would not accept it unless we paid Mr. Wilson's bill.

"Q. Well now, Mr. Wilson's bill, did he tell you at the time what it was for?

"A. No, sir.

"Q. And were you ready to pay?

"A. Yes, sir.

"Q. Did you have the money?

"A. The money was in the bank."     *     *     *

We quote from the testimony of David Doran:

"When I got there the bill was $845 and the bill against Mr. Wilson was $520.

"Q. Well, the only bill you questioned was the Wilson bill, $520?

"A. That was the bill I objected to.

"Q. Well, did you see or have any talk with Mr. Campbell after that date?

"A. Yes, sir.     I had a talk with him at the bank. I then called him up to get the money.     Mr. Borgman had the check.     He came up there.     I did not use the telephone, Mr. Campbell was in the bank.     I called him up to Mr. Borgman's desk.     An agreement had been made to meet there prior and get their money. I said to Mr. Borgman to pay him $845, but Mr. Campbell would not accept it unless I paid Mr. Wilson's bill.     So I told him there I would pay nothing."

The record is very long.     It would profit no one to go more in detail into the testimony.     It was contradictory.     The contract itself is very loosely drawn. It does not state clearly who was to furnish the material that was to go into the house in the first instance.     It does not in terms authorize Mr. Wilson to pledge the credit of defendants.     We think upon this record two questions should have been submitted to the jury, under proper instructions.     *First,* Were the

defendants liable to the plaintiff for the lumber? *Second,* If so, what was the extent of the liability?

The judgment is reversed, with costs to the defendants, and a new trial ordered.

STEERE, C. J., and WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.